UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMESON ASHLEY, et al.,

        Plaintiffs,

    v.

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

        Defendants.

Case No. 12-cv-00045-JST

**AMENDED ORDER GRANTING IN
PART AND DENYING IN PART
MOTION FOR SUMMARY
JUDGMENT**[1]

Re: ECF No. 89, 107, 118

    In this action for claims arising out of Plaintiff Ashley's 47-day jail detention for a misdemeanor charge, Defendants City and County of San Francisco, Sheriff Michael Hennessey, and Deputy Sheriff Curtis Edwards move for summary judgment on each of the claims that Ashley has asserted against them. Ashley opposes the motion. For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

### A. The Parties and Claims

    Plaintiff Jameson Ashley ("Ashley"), by and through his guardian ad litem, Lisa Ashley, brings this action against Defendants the City and County of San Francisco ("the City"), Sheriff Michael Hennessey, and Deputy Sheriff Curtis Edwards for claims arising out Ashley's arrest and 47-day detention in the San Francisco County Jail. First Am. Compl. ("FAC"), ECF No. 59.

    Plaintiff asserts the following claims against Defendants: (1) a claim under 42 U.S.C. § 1983 against Edwards for unreasonable seizure in violation of the Fourth Amendment; (2) a claim under California Civil Code Section 52.1 against Edwards for unreasonable seizure in

---

[1] The Court has reconsidered its prior order and now concludes that its grant of summary judgment on Plaintiff's Bane Act claim was in error. The Court's reasons are set forth below.

violation of Article I of the California Constitution and California Civil Code Section 43; (3) a claim under 42 U.S.C. § 1983 against Edwards for cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments; (4) a <u>Monell</u> claim against the City and Hennessey for failure to train; (5) a <u>Monell</u> claim against the City and Hennessey for failure to supervise; (6) false imprisonment against the City and Edwards; and (7) negligence against all Defendants.[2]

### B.     Facts

#### 1.     Ashley's Arrest and Detention

Ashley has suffered from emotional and behavioral ailments since he was an adolescent. Lisa Ashley Decl. ¶¶ 2-4.  He lived at his father's house in San Francisco until his father told him to leave on either October 19 or 20, 2010.  Ashley Dep. at 62, Russi Decl., Ex. A, ECF No. 90.  Ashley spent some time in Baker Beach after his father told him to leave the house.  <u>Id.</u>  He subsequently decided to walk to his mother's house in Sacramento.  <u>Id.</u> at 62.

On October 21, 2010, at approximately 3:46 a.m., a Golden Gate Bridge security officer noticed that Ashley was attempting to break into a storage compartment on the Bridge without authorization.  Gomez Decl. ¶¶ 1-2.  Ashley ran away from Gomez when he was spotted but three security officers eventually caught him, handcuffed him, and put him in their vehicle to await the arrival of the California Highway Patrol ("CHP").  <u>Id.</u> ¶¶ 3-6.  While Ashley was in the vehicle, he "realized" that he was being "kidnapped."  Ashley Dep. at 93-94.  Ashley tried to break the vehicle's windows with his handcuffs and his feet.  Gomez Decl. ¶ 6.  At this point, the security officers pulled Ashley out of the vehicle and placed him face down on the ground.  <u>Id.</u>  When the CHP officers arrived, Ashley continued to be uncooperative and belligerent.  <u>Id.</u>

CHP officer Frank McCallum and his partner responded to a dispatch call pertaining to the incident involving Ashley.  McCallum Decl. ¶¶ 1-2.  McCallum wrote in his report that he tried to obtain identifying information from Ashley, but Ashley refused to answer his questions.  <u>Id.</u>, Ex. A at 3.  McCallum arrested Ashley for trespassing in violation of California Penal Code section

---

[2] Ashley brings claims against the individual officers both in their individual capacities and in their capacities as officers for the City and County of San Francisco.  FAC ¶ 5.

602 and then placed him in the back seat of his vehicle before transporting him to the San Francisco County Jail. Id. McCallum then prepared a field arrest card identifying Ashley as "John Doe" and charging him for trespass in violation of California Penal Code Section 602. Id. at 4; Curran Decl., Ex. D. In his police report, McCallum also charged Ashley with resisting a peace officer in violation of California Penal Code Section 148(a)(1). Id.

When he arrived at the jail, Ashley was sent to medical and psychiatric triage to determine whether he was fit for being housed in the jail. Freeman Dep. at 26-28, Curran Decl., Ex. G. Ashley did not cooperate with Jail Health Services ("JHS") and told the staff that he was not taking any prescription medications. Goldenson Decl. ¶ 4 & Ex. A at CCSF_ASHLEY 00300.

After the JHS determined that Ashley was fit to be incarcerated, Ashley was sent to be booked by Defendant Edwards. Edwards Dep. at 82-83. At that point, Ashley's field arrest card identified Ashley as "John Doe." Id. at 91. Edwards asked Ashley to give him his real name and explained that doing so would enable Ashley to be "cited out as quickly as possible." Id. at 91. Ashley did not respond to Edwards; in fact, he did not speak at all. Id. at 91. Edwards then used white-out to change the name "John Doe" to "Richard Head" on the card. Id. at 84-87. Edwards entered this information into the jail's computer and filing system. Id. at 108-111. Edwards testified that the purpose of doing this was to get Ashley "processed into the system" and "to be funny."[3] Id. at 87. Edwards claims that he had not previously used the name Richard Head when booking other detainees. Id. at 87.

Ashley was then sent to "ID processing." Edwards Dep. at 97. This process, which is performed by non-uniformed employees of the Department, involves taking a detainee's fingerprints and running them through the California Law Enforcement Telecommunication System ("CLETS"), as well as taking a photograph of the detainee for identification. Freeman Dep. at 37; Gerrier Dep. at 23. The CLETS results, which were printed on October 22, 2010,

_____

[3] Deputy Edwards' attempt at humor rested on the fact that a common nickname for "Richard" is also a vulgarity.

3

showed that Ashley's real name was "Jameson Taylor Ashley." Lisa Ashley Decl., Ex. C.[4] An

unidentified person at the jail added the name "Ashley, Jameson" to Ashley's field arrest card as

an alias at some point during Ashley's detention. Edwards Dep. at 97-100; Curran Decl. Ex. D.

Ashley then was placed in a "safety cell" for observation because a JHS therapist

determined that Ashley was "gravely disabled." Dalmacio Decl. ¶¶ 1-4; Edwards Dep. at 79-81.

Edwards was assigned to monitor these safety cells. Edwards Dep. at 79-81. As he conducted his

monitoring, Edwards noticed that Ashley's arrest card had Ashley's real name on it as an alias. Id.

at 100, 102. Edwards testified that he did not change the name Richard Head to Ashley's real

name at this point because he "was doing more work and didn't really acknowledge the fact that it

could be done at that time" and because of "[h]uman error." Id. at 101.

Ashley recalls that at some point during his detention someone in uniform asked him

whether he was Jameson Ashley. Ashley Dep. at 118, 131. Ashley does not remember telling that

person or anyone else his real name. Id. at 118. Ashley recalls "being silent" throughout his

detention. Id. at 124. Ashley also recalls being told that he would be released if he signed a

citation; nevertheless, he recalls that he refused to sign any citation because his "feeling overall

was not to sign and to wait the whole situation out to talk to [his] lawyer." Id. at 133.

JHS staff then recommended that Ashley be transferred to the San Francisco General

Hospital ("SFGH") for a 72-hour evaluation under Section 5150 of the Welfare and Institutions

Code. Dalmacio Decl. ¶ 6. Ashley was taken to SFGH on October 22, 2010, and was sent back to

the jail on the same day because the examining doctor found him to be "gamey," selectively mute,

and not internally preoccupied. Dalmacio Decl. ¶ 7 & Ex. B. Ashley was then placed in

psychiatric housing at the jail and was monitored and evaluated by JHS staff. JPS staff met with

Ashley more than 10 times throughout his detention. Curran Decl., Ex. T; Goldenson Decl.,

Ex. A.

Ashley did not use the telephone at all while he was detained because he "had nobody to

---

[4] Lisa Ashley obtained a copy of this CLETS report from the San Francisco Sheriff's Department
after she filed a citizen's complaint on January 6, 2013. Lisa Ashley Decl. ¶¶ 13-14.

call" and was "well-fed," had "shelter," "was enjoying [himself]," and "accepted jail as something good." Ashley Dep. at 140-41.

Ashley was released from jail on December 9, 2010. After Ashley was released, he went to a homeless shelter but eventually settled in Sacramento with his mother. Ashley Dep. at 63. Ashley's mother believes that Ashley was in "dire" condition following his arrest and that his mental condition worsened significantly after he was released from jail. Id. ¶ 12.

### 2. Court Proceedings

Criminal proceedings on Ashley's misdemeanor charges began on October 22, 2010, in the San Francisco Superior Court. Ashley was charged with one count of trespass under section 27174.2 of the Streets and Highways Code and two counts of resisting or obstructing a peace officer under Section 148(a) of the California Penal Code. Req. for Judicial Notice, Ex. A.[5] Ashley did not appear at his initial hearing on October 22, 2010, because he was awaiting transfer to SFGH. The court ordered a 72-hour evaluation of Ashley under Section 5150, set bail at $5,000, and continued the arraignment to October 27, 2010. Id., Ex. B, C.

On October 27, 2010, the court appointed the Public Defender's Office to represent Ashley. Id., Ex. D at 2. The Public Defender waived arraignment and entered a plea of not guilty as to all charges. Id. Ashley was not present at this hearing, so the court continued the matter until the next day. Id. at 2.

On October 28, 2010, Ashley appeared in court. Id., Ex. E. During the hearing, a sign language interpreter helped Ashley communicate because Ashley refused to speak. The court expressed concerns as to Ashley's competency to stand trial. Id. at 2. The court suspended the criminal proceeding, appointed two doctors to conduct a psychiatric evaluation of Ashley, and continued the matter until November 22, 2010. Id., Ex. F at 3.

On December 6, 2010, the prosecutor reported that the two doctors who were appointed to

---

[5] Defendants request judicial notice of public filings pertaining to Ashley's prosecution in state court in connection with his purported trespass into the Golden Gate Bridge on October 20, 2010. ECF No. 95. Because the authenticity of these public documents cannot reasonably be questioned, the Court takes judicial notice of the documents. See Fed. R. Evid. 201.

conduct a psychiatric evaluation of Ashley concluded that Ashley was competent to stand trial. Id., Ex. G at 2. The court then reinstated the criminal proceedings and set bail at $5,000. Id. at 2-3.

On December 8, 2010, the court released Ashley on his own recognizance on the condition that he stay away from the Golden Gate Bridge. Id., Ex. H at 6.

On February 24, 2011, the court dismissed all charges against Ashley on a motion by the prosecution. The basis for the motion was that Ashley already had served 45 days in custody and currently was receiving counseling. Id., Ex. J.

### 3. Lisa Ashley's Search for Ashley

Ashley's mother, Lisa Ashley, filed a missing person's report with the San Francisco Police Department on October 22, 2010, the day after Ashley was arrested. Lisa Ashley Decl. ¶ 10. She had regular communications with Detective Yee of the Department in connection with her report; she contacted Detective Yee every two to three days between October 22, 2012, and "the end of November" to see whether her son or anyone who looked like her son was being held at the San Francisco County Jail. Id. ¶ 10. Each of these times, Detective Yee told her that a search for Jameson Ashley or John Doe had not returned any results for detainees at the local jails. Id. Ashley's mother also contacted local hospitals but was told that nobody under the name Jameson Ashley had been admitted. Id.

### 4. The Policies of the San Francisco Sheriff's Department

The San Francisco Sheriff's Department ("the Department") has a policy as of October 2010 that prohibits officers from releasing a person from custody by issuing a citation if the officer does not know the name of that person.[6] Freeman Decl., Ex. D. at 35-36, Russi Decl., Ex. C, ECF No. 90.

The Sheriff's Department also has a verbal policy prohibiting staff from booking a detainee under a fictitious name such as "John Doe." Freeman Dep. at 37-40, 56-57. Booking

---

[6] This is because under Section 835.6(i) of the Penal Code, a misdemeanor arrestee charged with a citable offense must sign a notice to appear agreeing to appear in court in order to be released.

agents at the Department receive training on this policy. Guerrier Dep. at 26, Curran Decl., Ex. N; Tongue Dep. at 25-26, Curran Decl., Ex. I. In situations where the arresting officer does not know the name of the detainee, the Department requires its staff to place the detainee in a private holding area and to explain to the detainee that identifying himself is in his best interest because no detainee can be released on a citation until the detainee identifies himself. Freeman Dep. at 38. If the detainee continues to refuse to identify himself for more than 12 hours, then the Department requires staff to notify the captain of the situation. If the situation is not resolved within 16 hours, then the captain is required to contact the undersheriff. Id. at 39.

Another policy of the Department prohibits staff from editing an arrest card once it is completed by the arresting officer. If changes to the card are necessary, the booking officer must notify the arresting officer so that that officer can make the change. Philpot Decl. at 26-29. Once all blanks in the field arrest card are filled out, the booking officer is under no duty to conduct any further investigation to determine whether or not the name on the card is the detainee's real name. Freeman Dep. at 54. During the fingerprint identification process, if the name that comes up in the system is different from the name under which a detainee was booked, then the booking officer is required to enter the new name as an alias on the field arrest card. Id. at 42.

### 5. Lisa Ashley's Post-Detention Complaint

Lisa Ashley filed a citizen's complaint against the San Francisco Sheriff's Department on January 6, 2011, in connection with Ashley's detention. Lisa Ashley Decl. ¶ 13. The complaint alleged that an unknown representative of the Department improperly used the false name of Richard Head to refer to her son, which prevented her from locating her son for more than four weeks. Id. ¶ 13 & Ex. A. The Department sent Lisa Ashley a letter on March 7, 2011, stating that the Department sustained the allegations of misconduct against "the staff member." Id. ¶ 13 & Ex. B. The Department suspended Edwards for two days without pay as a result of having written Richard Head on Ashley's arrest card. Edwards Dep. at 132.

### C. Jurisdiction

The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, and 1367.

## II.    LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials. Fed. R. Civ. P. 56(c)(1)(A). A party also may show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A fact is "material" if the fact may affect the outcome of the case. Id. at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show that a genuine issue of material fact exists. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).

The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). Indeed, it is not the duty of the district court to "to scour the record in search of a genuine issue of triable fact." Id. "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for

summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted).  If the non-moving party fails to make this showing, the moving party is entitled to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## III.    DISCUSSION

### A.    Claim under § 1983 for "Unreasonable Seizure" in Violation of the Fourth Amendment

Ashley alleges that Edwards violated his rights under the Fourth Amendment by booking him into custody under a false name and by failing to amend his booking card to reflect his true name after Deputy Edwards became aware of this information.  Ashley alleges that the use of a false name resulted in his "unreasonably protracted detention."  FAC ¶ 30.

Edwards moves for summary judgment with respect to this claim on the ground that there is no evidence showing that Ashley's arrest and detention was unlawful or that Edwards was involved in Ashley's arrest and detention.  Mot. at 11-12.  Edwards also argues that any claim for unlawful arrest or detention is limited to the period of time between Ashley's arrest and the time at which the court ordered Ashley's Section 5150 evaluation, because any false imprisonment claim ends once a detainee is "bound over by a magistrate or arraigned on charges."  Mot. at 11-12 (citing Wallace v. Kato, 549 U.S. 384, 389 (2007)).  Finally, Edwards argues that he is entitled to qualified immunity with respect to this claim because there is no constitutional right to be booked under a certain name, and even if such a right exists, the right was not clearly established at the time he booked Ashley as Richard Head.

Ashley opposes the motion, arguing that "sufficient facts have been established" to support a claim for unreasonable seizure under the Fourth Amendment based on Edwards' alteration of his field arrest card, as these facts show that this act "unnecessarily extended" his detention and "put him beyond the reach of persons attempting to locate him."  Opp'n at 13.  Ashley also argues that Edwards is not entitled to qualified immunity because he "violated his training" when he altered

his arrest card.  Opp'n at 14.  Finally, Ashley argues that Defendants violated his Fourth Amendment rights by failing to provide him with a timely probable cause hearing following his arrest.

"Section 1983 imposes two essential proof requirements upon a claimant: (1) that a person acting under color of state law committed the conduct at issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States."  Leer v. Murphy, 844 F.2d 628, 632–33 (9th Cir. 1988).

Qualified immunity is an affirmative defense that "shied[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."  Pearson v. Callahan, 555 U.S. 223, 244 (2009).  "The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation."  Wilkins v. City of Oakland, 350 F.3d 949, 954 (9th Cir. 2003). "The threshold determination of whether the law governing the conduct at issue is clearly established is a question of law for the court."  Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993). "The second step of the analysis, which the court reaches only if it determines that the alleged conduct violates a clearly-established constitutional right, is to inquire whether the officer was reasonable in his belief that his conduct did not violate the Constitution."  Wilkins, 350 F.3d at 954-55.

The Court concludes that Ashley's claim fails on qualified immunity grounds, because Edwards' booking of Ashley under the name Richard Head does not give rise to a clearly established violation of the Fourth Amendment.

In a § 1983 action, the plaintiff "bears the burden of proving that the right allegedly violated was clearly established at the time of the official's allegedly impermissible conduct."  Camarillo v. McCarthy, 998 F.2d 638, 640 (9th Cir. 1993).  To be a clearly established constitutional right, a right must be sufficiently clear "that every reasonable official would [have understood] that what he is doing violates that right."  Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012) (citation and internal quotation marks omitted).  In other words, "existing precedent must have placed the statutory or constitutional question beyond debate."  Id. (citation and internal

quotation marks omitted) (emphasis added). Here, the Court cannot conclude that it is beyond debate that being booked under a false name gives rise to a § 1983 claim for violation of a Fourth Amendment right because no court has ever held that an officer's intentional booking of a detainee under a false name violates a constitutional right of the detainee.[7]

Ashley argues that Edwards is not protected from qualified immunity because he violated the Department's policies with respect to the booking of detainees, which prohibited him from altering Ashley's arrest card and required him to contact his supervisor if Ashley had not identified himself within 12 hours. Ashley relies on Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1059 (9th Cir. 2003) for the proposition that an officer's conduct is not protected by qualified immunity when the officer has had notice through his training that the conduct at issue is unreasonable.

Drummond is inapposite. In Drummond, the Ninth Circuit determined that two police officers were not entitled to qualified immunity with respect to a § 1983 claim premised on their purported use of excessive force during a detention. In accordance with the two-step qualified immunity analysis, the Ninth Circuit first concluded that the plaintiff's factual allegations "establish[ed] a constitutional violation" because the use of excessive force by police officers constitutes a violation of the Fourth Amendment. Id. at at 1059. After concluding that the constitutional right at stake was clearly established, the Ninth Circuit then proceeded to the second prong of the analysis and considered whether the police officers' training materials could have given them a "fair warning" that the force they used was constitutionally excessive. Id. The Ninth Circuit reasoned that the "training materials [we]re not dispositive" of this issue but noted that the

---

[7] Ashley filed a second motion to file a declaration by Herman Holland, the Public Defender who represented him in state court in connection with the incidents giving rise to his arrest. ECF No. 118. The Court previously denied a similar motion on the grounds that the motion failed to comply with Rule 56(d) and that Ashley was not diligent in seeking to file Holland's declaration. ECF No. 117. The only difference between the first and second motions is that the latter contains Holland's proposed declaration as an attachment. The Court DENIES the second motion for the same reasons articulated in its prior order, and for the additional reason that the matters in Holland's declaration would have no effect on the Court's determination of Defendants' motion for summary judgment.

materials were a factor in "evaluating whether a particular use of force is constitutionally unreasonable." Id. The Ninth Circuit ultimately concluded that the officers had had "fair warning" that the force they used was unreasonable in light of the training materials and the "ample publicity" that similar excessive force incidents had received in the officers' locality. The Ninth Circuit in no way implied that a constitutional duty could arise from the act of having received training materials.

Here, in contrast, the Court has determined that Ashley's allegations in connection with his § 1983 claim do not give rise to a violation of clearly established Fourth Amendment law. As such, the Court's inquiry ends at the first prong of the qualified immunity analysis. Wilkins, 350 F.3d at 954 ("The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation."). The Court accordingly does not reach the question of whether Edwards' training put him on notice that his actions were constitutionally unreasonable, because that inquiry would come into play only under the second prong of the qualified immunity analysis.

Moreover, to the extent that Ashley contends that Edwards' failure to comply with the Department's policies in itself violated his Fourth Amendment rights, the contention is unavailing because the Ninth Circuit has squarely rejected the notion that constitutional duties can arise from a governmental entity's policies. See Devereaux v. Perez, 218 F.3d 1045, 1056 (9th Cir. 2000) (holding that internal policy manuals "do not constitute decisional giving rise to a constitutional duty under § 1983").

Finally, to the extent that Ashley contends that his Fourth Amendment rights were violated because he was not provided with a timely probable cause hearing, such a theory fails because Ashley did not plead it in the complaint, and he therefore cannot proceed under that theory at summary judgment. See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083, 1089 (9th Cir. 2010) (holding that the plaintiff "may not effectively amend its Complaint by raising a new theory . . . in its response to a motion for summary judgment"); see also Wasco Products, Inc. v. Southwall Technologies, Inc., 435 F.3d 989, 992 (9th Cir. 2006)

1  ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate

2  pleadings.").

3       **B.**     **Claim Under § 1983 for Violations of the Eighth and Fourteenth Amendments**

4       Ashley alleges that his detention in the San Francisco County Jail under a false name for

5  more than six weeks violated his rights under the Eight and Fourteenth Amendments because it

6  constituted cruel and unusual punishment.  FAC ¶ 40.

7       Edwards moves for summary judgment on this claim.  He argues that his use of a false

8  name when booking Ashley does not amount to a constitutional violation, that there is no evidence

9  on the record showing that he had any involvement with Ashley's confinement after he booked

10  him, and that there is no evidence showing that there is any connection between the false name

11  that Edwards used and the length of Ashley's confinement.  Edwards also argues that he is entitled

12  to qualified immunity because "there was no clearly established legal authority putting Deputy

13  Edwards on notice that booking an uncooperative arrestee into the jail using a fictitious name was

14  unconstitutional."  Mot. at 17.

15       Ashley opposes the motion, arguing that the record demonstrates that (1) Edwards showed

16  "deliberative indifference" in violation of the Eighth Amendment by booking him under a false

17  name and by failing to later correct this name because Edwards knew or should have known about

18  Ashley's psychological problems; (2) the nursing staff failed to provide him with the necessary

19  psychiatric treatment during his detention; and (3) Edwards' use of a false name during the

20  booking process violated his due process rights.  Ashley also argues that Edwards is not entitled to

21  qualified immunity because he violated his training and the policies of the Department with

22  respect to the intake of detainees.

23       "Claims by pretrial detainees are analyzed under the Fourteenth Amendment Due Process

24  Clause, rather than under the Eighth Amendment.  Because pretrial detainees' rights under the

25  Fourteenth amendment are comparable to prisoners' rights under the Eighth Amendment,

26  however, [courts] apply the same standards."  <u>Frost v. Agnos</u>, 152 F.3d 1124, 1128 (9th Cir. 1998)

27  (citations omitted).

28

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, 'sufficiently serious.'" Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citation omitted). A deprivation is sufficiently serious when it results in the denial of "the minimal civilized measure of life's necessities." Id. (citation omitted).

"The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment. To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind. In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety." Id. (internal citations and quotation marks omitted). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain[.]" Estelle v. Gamble, 429 U.S. 97, 104-106 (1976) (citation and internal quotation marks omitted) (holding that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs").

The Court concludes that Edwards is entitled to summary judgment on qualified immunity grounds with respect to this claim, because Edwards' booking of Ashley under a knowingly false name, although mean-spirited and cruel, does not give rise to a violation of the Eighth Amendment. No court has ever held that an officer's intentional failure to book a detainee under the detainee's own name constitutes a violation of the Eighth Amendment or that a detainee's capacity to be located by his family while in jail is a "life necessity" within the meaning of the Eighth Amendment. As such, the Court cannot conclude that the Eighth Amendment rights that Ashley claims were violated were clearly established at the time Edwards performed the acts at issue.

That Edwards failed to comply with the Department's policies or with his training does not give rise to a constitutional violation, as discussed above. It also does not deprive him of qualified immunity, because the policies and training at issue would become relevant only if Court first concludes that a constitutional right was violated, and here, the Court has not reached that

conclusion.

To the extent that Ashley's claim is predicated on the purported failure of JHS to provide him with the "necessary medical treatment" during his detention, the claim fails because there is no evidence on the record showing that Edwards was in any way involved with JHS or the treatment that they provided or failed to provide to Ashley. There also is no evidence showing that JHS unnecessarily and wantonly denied Ashley medical treatment or any other life necessity within the meaning of the Eighth Amendment. To the contrary, the record shows that JHS staff continuously monitored Ashley and met with him at least 10 times during his detention. Though Ashley argues that JHS' failure to diagnose his psychiatric condition constitutes a violation of his Eighth Amendment rights, the argument is unavailing because the Ninth Circuit has expressly rejected this theory of liability. See Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights.").

Finally, to the extent that Ashley's Eighth Amendment claim is predicated on purported violations of his due process rights, the claim fails because it is not pleaded in the complaint. See La Asociacion de Trabajadores, 624 F.3d at 1089 (holding that the plaintiff "may not effectively amend its Complaint by raising a new theory . . . in its response to a motion for summary judgment").

Accordingly, Edwards' motion is granted with respect to this claim.

**C.     Claim under Monell for Failure to Train or to Supervise**

Ashley alleges that the City and Hennessey's failure to adequately train or supervise their employees on the proper intake and medical treatment of detainees resulted in the violation of his constitutional right to be free from excessive force, unreasonable seizures, and cruel and unusual punishments. FAC ¶¶ 43-45; 49-53.

Defendants move for summary judgment on this claim on the ground that Ashley cannot establish a violation of a constitutional right, which is a precondition for municipal or supervisory liability under Monell, and that even if Ashley could establish a constitutional violation, there is

no evidence on the record to support the claim.

Ashley opposes the motion, arguing that the Department's policy of prohibiting staff from altering field arrest cards prevented his family from locating him during his detention, which in turn led him to be detained for a misdemeanor for 47 days. Ashley also argues that the Department's failure to train Edwards on "the treatment and handling of persons with psychiatric disorders" subjects the department to <u>Monell</u> liability. Notably, Ashley does not identify the constitutional right or rights he claims were violated.

Municipalities are liable under section 1983 when "action pursuant to official policy of some nature cause[s] a constitutional tort." <u>Monell v. Department of Social Services of New York</u>, 436 U.S. 658, 691 (1978). An action or policy can be "official" if "made by [the municipality's] law makers or by those whose edicts or acts may fairly be said to represent official policy." <u>Id.</u> at 694. "Monell requires only that the official policy cause the constitutional violation, not that the policy itself be unconstitutional." <u>McKinley v. City of Eloy</u>, 705 F.2d 1110, 1117 (9th Cir. 1983). "Conversely, municipalities are not subject to section 1983 liability under a respondeat superior theory for the isolated torts of their employees." <u>Id.</u> at 116.

To establish liability under <u>Monell</u>, a plaintiff must satisfy four conditions: "(1) that he possessed a constitutional right of which he was deprived; (2) that the [local governmental entity] had a policy; (3) that this policy 'amounts to deliberate indifference' to plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" <u>Oviatt v. Pearce</u>, 954 F.2d 1470, 1474 (9th Cir. 1992) (citation omitted).

A failure to train or supervise can amount to a "policy or custom" sufficient to impose liability on a municipality. <u>Anderson v. Warner</u>, 451 F.3d 1063, 1070 (9th Cir. 2006). This theory of liability can prevail only where the failure to train or supervise "amounts to deliberate indifference to the rights of persons with whom the police come into contact." <u>See Alexander v. City & Cnty. of San Francisco</u>, 29 F.3d 1355, 1367 (9th Cir. 1994). A showing of deliberative indifference requires allegations and evidence showing "a program-wide inadequacy" in training or supervision that was "the result of a deliberate or conscious choice." <u>See Alexander v. City &</u>

Cnty. of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994) (citations and internal quotation marks omitted).

Here, part of Ashley's <u>Monell</u> claims are premised on the Department's policy of prohibiting officials from amending the names on field arrest cards. These claims fail because, as discussed above, the use of a false name on Ashley's arrest card does not give rise to a constitutional violation, which is a prerequisite for <u>Monell</u> liability.

The remainder of his <u>Monell</u> claims are predicated on the acts or omissions of Edwards in connection with Ashley's mental disorders. Ashley's theory is that the Department failed to properly train and supervise Edwards on booking and treating detainees with mental disorders. Ashley's claim fails because Ashley does not identify the treatment or mishandling at issue or explain how this alleged treatment or mishandling deprived him of a constitutional right. The claim also fails because his allegations and evidence are limited to the adequacy of Edwards' training. When a plaintiff limits her proof to the adequacy of the training of a single officer, no genuine issue of fact exist as to the deliberately indifferent character of a municipality's failure to train. <u>See</u> <u>Alexander v. City & Cnty. of San Francisco</u>, 29 F.3d 1355, 1368 (9th Cir. 1994) ("By limiting her proof to the adequacy of the training of a single officer, plaintiff has failed to create a genuine issue of fact as to the alleged deliberate indifference of the municipality.").

Accordingly, Defendants' motion for summary judgment on Ashley's <u>Monell</u> claims is GRANTED.

**D.      Claim Under California Civil Code Section 52.1**

Ashley alleges that Edwards interfered with his rights under the California Constitution in violation of Section 52.1 by booking him into custody under a false name and by failing to amend his booking card to reflect his true identity, as these actions resulted in his "unlawful and protracted detention." FAC ¶¶ 34-35.

Edwards moves for summary judgment on this claim on the ground that there is no evidence of a threat, coercion, or intimidation by Edwards or by any other City employee with respect to Ashley.

Ashley opposes the motion, arguing that "distinct acts of coercion occurred when Deputy Edwards showed a deliberate indifference to plaintiff's readily observable psychiatric disorders and where the Sheriff's Department, including its affiliated entity Jail Psychiatric Services, failed to competently treat and diagnose plaintiff's demonstrable psychiatric issues while he was in custody." Opp'n at 15.

Section 52.1, the Bane Civil Rights Act, prohibits interfering with "the exercise or enjoyment . . . of rights secured by the Constitution or laws of the United States or the rights secured by Constitution or laws of this state" through "threats, intimidation, or coercion." Cal. Civ. Code § 52.1. "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." Austin B. v. Escondido Union School Dist., 149 Cal. App. 4th 860, 883 (Cal. Ct. App. 2007) (citation omitted). Liability under Section 52.1 "requires an attempted or completed act of interference with a legal right, accompanied by a form of coercion." Jones v. Kmart Corp., 17 Cal. 4th 329, 334 (Cal. 1998).

Defendants argue that Ashley cannot show the element of coercion required by Section 52.1 because "the statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself," citing Shoyoye v. County of Los Angeles, 203 Cal. App. 4th 947, 959 (2012). However, Defendants overlook recent authority from this same court holding that "the relevant distinction for purposes of the Bane Act is between intentional and unintentional conduct, and that Shoyoye applies only when the conduct is unintentional" – meaning that a showing of coercion separate from the independent act is not required. M.H. v. Cnty. of Alameda, 11-CV-02868 JST, 2013 WL 1701591, at *7 (N.D. Cal. Apr. 18, 2013). In M.H., this Court also concluded that deliberate indifference is closer to intentional conduct, and should be judged accordingly. Id. at *8.

Shoyoye is also distinguishable on its facts. In that case, the plaintiff was wrongfully detained as a result of the negligence of jail employees, who unintentionally and erroneously

18

assigned the plaintiff to a parole hold in the computer system and then failed to correct that error. Shoyoye, 203 Cal. App. 4th at 961. Here, Deputy Edwards' conduct was intentional, not negligent. His purposeful act in making Ashley more difficult to locate constituted "coercion independent from the violation of [Ashley's] right to be free from an unlawful detention," which was missing in Shoyoye. Id. at 962.

The Court also finds that Ashley has introduced sufficient evidence on the second prong of his Bane Act claim, which requires that the defendant attempt to interfere, or interfere, with a legal right of plaintiff. This element is satisfied by Deputy Edwards' intentional booking of Ashley under a false name, because that act violated Ashley's right to be free from unlawful seizure.[8] Although Ashley was lawfully taken into custody, a reasonable jury could find that Edwards' act increased the likely duration of Ashely's period of confinement. This conclusion is consistent with Fourth Amendment jurisprudence in the area of police detentions, which holds that an otherwise lawful stop violates the Fourth Amendment if police unreasonably delay, See, e.g., United States v. Aparicio-Lopez, 425 F. App'x 655, 656 (9th Cir. 2011) (unreasonably prolonging a detention requires additional Fourth Amendment justification); United States v. Frost, 999 F.2d 737, 742 (3d Cir. 1993) (noting that a demonstrated lack of concern or lack of diligence by officers which prolongs an investigative seizure can render a detention unreasonable for Fourth Amendment purposes).

Defendants' motion for summary judgment on this claim is DENIED.

**E.    False Imprisonment**

Ashley alleges that Defendants "intentionally confined" him for "more than six weeks without his consent" by booking him under a false name and by failing to amend his booking card

---

[8] As previously noted, no court has ever held that an officer's intentional booking of a detainee under a false name violates a constitutional right of the detainee. This Court now so holds.

In their motion, defendants mischaracterize the asserted right at issue as "the constitutional right to be booked into a jail under his or her legal name." Ashley is not asserting such a right. He is asserting the right not to be booked under a name that authorities know is false.

19

to reflect his true identity. FAC ¶¶ 55-57.

Defendants move for summary judgment on this claim on the ground that Ashley's arrest was lawful.

Ashley opposes the motion, arguing that his false imprisonment claim is based on the Department's "unnecessary delay" in releasing him from custody, which was caused by Edwards' failure to amend his arrest card to reflect his true name and by the Department's failure to provide him with a probable cause hearing within 48 hours of his arrest.

"Under California law, false imprisonment is a violation of the personal liberty of another accomplished without lawful authority. There are two bases for claiming false imprisonment: imprisonment pursuant to a false arrest and unreasonable delay in bringing the arrested person before a judicial officer." Estate of Brooks ex rel. Brooks v. United States, 197 F.3d 1245, 1248 (9th Cir. 1999) (internal citations and quotation marks omitted).

The Court concludes that Defendants are entitled to summary judgment on this claim. Here, Ashley does not contend that his arrest was unlawful. Instead, his claim is premised on the use of a false name on his arrest card, which he claims unreasonably delayed his release from jail. A claim for false imprisonment based on unreasonable delay must be predicated on a failure to bring the arrested person before a judicial officer within 48 hours of the arrest. See Estate of Brooks, 197 F.3d at 1248; see also Cal. Penal Code § 825(a) (providing that a "defendant shall in all cases be taken before the magistrate without unnecessary delay, and, in any event, within 48 hours after his or her arrest, excluding Sundays and holidays"). There is no evidence of unreasonable delay in the record. On the contrary, the record shows that the state court held a hearing on the charges that were brought against Ashley on the day after Ashley was arrested. Accordingly, Defendants' motion for summary judgment on this claim is GRANTED.

**F.    Negligence**

Ashley alleges that Defendants owed him a "duty of care," and that Defendants breached this duty by booking him under a false name, failing to amend his booking card after they learned of his true identity, failing to provide him "competent" medical services, and by detaining him for

more than six weeks on a misdemeanor charge. FAC ¶¶ 61-62. Ashley further alleges that he suffered emotional distress, humiliation, and an exacerbation of his pre-existing mental health problems as a result of this breach.

Defendants move for summary judgment on this claim. Defendants argue that a claim for negligence against the City cannot lie unless the claim is successfully asserted against a City employee who was acting within the scope of his employment. Defendants further contend that Edwards is the only City employee that Ashley has identified as acting negligently. To the extent that Ashley's claim is premised on Edwards' acts or omissions with respect to Ashley's medical treatment, Defendants argue that the claim fails because there is no evidence showing that Edwards was involved in Ashley's medical treatment. And, to the extent that Ashley's claim is predicated on Edwards' use of a false name on Ashley's arrest card, the claim also fails because Ashley has not cited to any authority establishing that Edwards owed Ashley a duty of care, or pointed to any evidence showing that Edwards' actions caused him foreseeable harm.

Under the California Tort Claims Act, Cal. Gov. Code, § 810 et seq., a public entity is not liable for injury arising from an act or omission except as provided by statute. Section 815.2(a) is one such statute. It provides that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee[.]" Cal. Gov't Code § 815.2. Thus, "the general rule is that an employee of a public entity is liable for his torts to the same extent as a private person and the public entity is vicariously liable for any injury which its employee causes to the same extent as a private employer." Hoff v. Vacaville Unified Sch. Dist., 19 Cal. 4th 925, 932 (Cal. 1998) (citations and internal quotation marks omitted).

To establish the negligence of a police officer under California law, a plaintiff must demonstrate that (1) the officer owed the plaintiff a duty of care, (2) the officer breached the duty by failing to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise, (3) there was a proximate causal connection between the officer's negligent

conduct and the resulting injury to the plaintiff, and (4) the officer's negligence resulted in actual loss or damage to the plaintiff.  Harris v. Smith, 203 Cal. Rptr. 541, 543 (Cal. Ct. App. 1984) (citations and internal quotation marks omitted).

The Court concludes that a genuine issue of material fact exists with respect to this claim as it pertains to Deputy Edwards' use of a false name to book Ashley,[9] and thus, Defendants' motion for summary judgment on this claim must be denied.  Specifically, as will be discussed below, there is sufficient evidence on the record to establish duty, breach, and damages.  Reasonable minds could differ, however, on whether the evidence on the record supports a finding of causation.

### 1. Duty

"The existence of a duty of care is a question of law to be determined by the court alone." Hernandez v. KWPH Enterprises, 116 Cal. App. 4th 170, 176 (Cal. Ct. App. 2004) (citations and internal quotation marks omitted).  "In determining the existence of a duty of care in a given case, pertinent factors to consider include the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.  When public agencies are involved, additional elements include the extent of [the agency's] powers, the role imposed upon it by law and the limitations imposed upon it by budget[.]"  Davidson v. City of Westminster, 32 Cal. 3d 197, 203 (Cal. 1982) (internal citations and quotation marks omitted).

The Court concludes that Edwards had a duty of care with respect to Ashley.  Several of the Davidson factors strongly support a finding that a duty of care existed in this case.  Edwards owed some care to Ashley as a result of his status as the officer responsible for booking Ashley

---

[9] Ashley appears to have abandoned his negligence claim premised on the medical treatment he received.

into the jail. Edwards' conduct, namely his use of the name Richard Head when booking Ashley, was morally reprehensible. Ashley's lack of cooperation during the booking process is no justification for using a derogatory, insulting name, particularly when Edwards' dominant motivation appears to have been his own amusement and that of his fellow deputies. When Ashley was placed in a safety cell, Edwards knew or should have known that Ashley suffered from psychiatric problems. In light of this knowledge, it should have been clear to Edwards that Ashley's refusal to provide identifying information was likely the result of his mental health issues as opposed to any desire to be uncooperative or difficult. Edwards also should have realized that using a pseudonym other than John Doe could make it difficult for Ashley's family members to locate him. For this reason, Edwards should have either changed the name on Ashley's arrest card, or should have contacted someone else so that this correction could be made. A finding of duty of care in this case is likely to deter future misconduct by police officers. At the same time, such a finding is unlikely to impose a great burden on the Department or the community, because incidents such as the one at issue appear to be uncommon, and because the Department and the City will be able to prevent future incidents by better training and supervising booking officers. In this regard, it is worth noting that the Edwards' conduct did violate Department policy and that he was disciplined for this violation.

Accordingly, this element is met.

### 2. Breach

A police officer breaches a duty of care when he fails to use such skill, prudence, and diligence as other members of [the] profession commonly possess and exercise. Harris v. Smith, 203 Cal. Rptr. at 543 (citations and internal quotation marks omitted). The question of whether a duty has been breached is normally a question of fact. Hernandez v. KWPH Enterprises, 116 Cal. App. 4th 170, 175 (Cal. Ct. App. 2004).

Here, it is undisputed that Edwards intentionally replaced the name John Doe with Richard Head on Ashley's arrest card despite his awareness of the Department's policy that prohibits staff from making any amendments to arrest cards. This intentional violation of the Department's

policy constitutes a breach of the duty of care he owed to Ashley.

Accordingly, this element also is met.

### 3. Causation

"Under California law, the proximate cause of an injury is a cause which is a substantial factor in bringing about the injury.  Generally causation is a question of fact for the jury.  However, it may be determined as a matter of law when reasonable persons could not dispute the absence of causation."  Desrosiers v. Flight Int'l of Florida Inc., 156 F.3d 952, 956 (9th Cir. 1998) (internal citations and quotation marks omitted).

With respect to this element, the Court concludes that conflicting inferences can be drawn from the evidence on the record.  On the one hand, the evidence shows that Ashley's mother called the Department continuously throughout Ashley's detention and thus would have been able to locate him if he had been booked under his own name, or possibly even under the name John Doe.  A reasonable juror could conclude that the presence of Ashley's mother at the jail could have persuaded Ashley to sign the citation, which would have resulted in an earlier release and would have prevented the worsening of Ashley's psychiatric ailments.  On the other hand, a reasonable juror could conclude that Ashley would have continued to refuse to sign the citation even if his mother had been able to locate him in light of his own statements that he was "enjoying" himself in jail.

Accordingly, a genuine issue of material fact exists with respect to this element.

### 4. Damages

Lisa Ashley filed a declaration stating that Ashley's psychiatric condition worsened significantly after his arrest and 47-day detention.  This is sufficient to establish damages.

### G. Evidentiary Objections

Defendants move to strike Ashley's separately filed evidentiary objections on the ground that the objections violate Civil Local Rule 7-3, which requires the filing of evidentiary objections "within the brief or memorandum" filed in opposition to a motion.  See Civil L.R. 7-3(a).  Because the objections at issue do not comply with Civil Local Rule 7-3, Defendants' motion to

strike is GRANTED.  See Beauperthuy v. 24 Hour Fitness USA, Inc., 772 F. Supp. 2d 1111, 1119

(N.D. Cal. 2011) (striking evidentiary objections that were not contained in the opposition brief as

required by Civil Local Rule 7-3).  The Court will not consider these objections.

**IV.    CONCLUSION**

Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN

PART as follows:

1.    Edwards' motion for summary judgment on Ashley's § 1983 claim for violations of
his Fourth Amendment rights is GRANTED.

2.    Edwards' motion for summary judgment on Ashley's § 1983 claim for violations of
his Eight and Fourteenth Amendment rights is GRANTED.

3.    The City and Hennessey's motion for summary judgment on Ashley's Monell
claims is GRANTED.

4.    Edwards' motion for summary judgment on Ashley's claim under Section 52.1 is
DENIED.

5.    Defendants' motion for summary judgment on Ashley's false imprisonment claim
is GRANTED.

6.    Defendants' motion for summary judgment on Ashley's negligence claim is
DENIED.

**IT IS SO ORDERED.**

Dated:  February 4, 2014

_____
JON S. TIGAR
United States District Judge